## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

JOSEPH BOND

       Plaintiff,

  vs.

BLUE WATER CAPITAL LLC

       D/B/A FLEETSMARTS

    Defendant.

Case No. 1:24-cv-01612-VMC

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## BLUE WATER CAPITAL LLC'S MOTION TO DISMISS

## I.    INTRODUCTION

Defendant Blue Water Capital LLC d/b/a FleetSmarts' (FleetSmarts or Defendant) motion to dismiss must be denied because the Plaintiff has pled that he received the illegal calls at issue to his residential telephone number, which is subject to the protections afforded by the National Do Not Call Registry. Those allegations, bolstered by Mr. Bond's previous affidavit, are to be afforded substantial credit and weight. When the Court denied FleetSmarts' first motion without prejudice, it ordered jurisdictional discovery because the record then "does not indicate the extent of FleetSmarts's marketing efforts or revenue in Georgia," and FleetSmarts' declaration "does not specifically deny that it markets to Georgians."

That discovery is now complete, and it supplies exactly what the Court asked for: FleetSmarts has 14,083 customers and $27,727,607 in revenue overall. Of those, 802 customers, or a little over 5% with Georgia addresses, generated approximately $252,941 in Georgia-attributed revenue. (Resp. to Rog. No. 3, 4). And, of particular relevance here, between August 2, 2023 and April 16, 2025, FleetSmarts made at least 4,582 calls (although the response is unclear as to whether this includes text messages) to Georgia numbers. (Resp. to Rog. No. 6). And contrary to the Defendant's original assertions in its motion, the messages were sent not from the Defendant's headquarters in Utah but rather using third

party contractors Defendant hired in the Philippines. (Rawlins Dep.) Discovery

into the number that texted Mr. Bond has confirmed that the number was registered

in Defendant's name and was sent to a Georgia resident, Bond, with a Georgia

telephone number. Moreover, FleetSmarts has admitted that its "marketing efforts"

consist of outbound calls and text messages and are not restricted by state. As such,

Defendant solicits nationwide, including Georgia. This record satisfies O.C.G.A. §

9-10-91(1) and (3), due process, and the wealth of TCPA-specific authority

imposing specific personal jurisdiction in the recipient state where the sender of an

illegal call directs their conduct into a recipient's state.

Moreover, this Court should reject the additional non-jurisdictional

arguments that Blue Water has proffered in its original motion, including as to the

residential or business use of the number. The Court should likewise decline

Defendant's second invitation to engage in another bifurcated discovery period.

The renewed motion should be denied, and this case should proceed to discovery

for all purposes forthwith.

## II.    LEGAL STANDARD

In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in

the complaint as true and draw all reasonable inferences supported by the well

pleaded factual allegations in the plaintiff's favour. *Oldfield v. Pueblo De Bahia

Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009). However, a Rule 12(b)(2)

3

challenge is unique in that it is not limited to the four corners of the pleading and the Court may consider additional evidence proffered by both parties, including affidavits, evidence, and judicially noticeable records. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all the allegations in the complaint and construes them in the light most favourable to the plaintiff. *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990) To survive a motion to dismiss, a complaint must contain sufficient facts which, if accepted as true, state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible where the plaintiff pleads factual content that would allow a court to draw the reasonable inference that defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## III.    ARGUMENT

A.    *The Defendant sent the subject messages to a telephone number associated with Georgia in order to conduct substantial business in Georgia. Defendant is therefore subject to specific personal jurisdiction in Georgia.*

There exist two types of personal jurisdiction: general and specific. Specific personal jurisdiction exists when the defendant has "purposefully directed his

activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). General personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are "continuous and systematic." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). As a preliminary matter, the Plaintiff does not contest that this court lacks *general* jurisdiction over Defendant.

Generally speaking, a federal court may assert *specific* personal jurisdiction over a nonresident defendant when it commits "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Furthermore, the plaintiff's claims "must arise out of or relate to the" defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414. To demonstrate purposeful availment, the plaintiff need only show (1) that the defendant conducted some activity in the forum so as to subject it to personal jurisdiction there and (2) that the constitutional notions of fair play and substantial justice are satisfied such as to be consistent with due process requirements. *Burger King*, 471 U.S. 462, 464 (1985). This Court exercises personal jurisdiction over a nonresident defendant of the forum state to the maximum extent authorized by the law of the forum, usually as dictated by the state's long arm statute. FED R. CIV. P. 4(e), (k)(1).

As the Plaintiff originally explained, in calling a number that it *admits it knew* was associated with a telephone *within Georgia*, and then in continuing this conduct of business by *sending a fuel card to a Georgia address*, Defendant also necessarily admits that it knowingly transacted business in Georgia and that this case "arises from". . . "transact[ing] any business within [Georgia]. Defendant also committed a tortious act from outside Georgia, while deriving substantial revenue and regular and persistent conduct in Georgia. O.C.G.A. § 9-10-91(1), (3). Moreover, discovery has all but confirmed the propriety of the exercise of specific personal jurisdiction in light of the Court's prior concerns about the extent of Georgia-directed activity on both such bases. Discovery in this matter has revealed several critical points illustrating the propriety of the exercise of personal jurisdiction here under sections (1) and (3) of the statute.

First, and most importantly, discovery has revealed that the telephone number which sent the text messages at issue was and is registered, to this day, in FleetSmarts' name. (Exhibit A). Moreover, as the deposition of Mr. Rawlins makes clear, FleetSmarts obtained the telephone numbers it called from the US Department of Transportation database from all over the country and then had contractors in the Philippines send the subject messages at issue using its Amazon telephone number account. So, contrary to the Defendant's original assertion that it contacted the numbers from its offices in Utah, discovery has revealed that

Defendant instead hired contractors in the Philippines to send the text messages using the telephone number that it registered and paid for using telephone numbers it provided, including to thousands of Georgia residents,[1] which make up over 5% of its customer base and hundreds of thousands of dollars in revenue. Defendant's marketing efforts consisted entirely of outbound calls and texts to those numbers and were not targeted nor restricted to any particular state. (Resp. to Rog No 5).

*Second*, and more generally, FleetSmarts transacts persistent and substantial business in Georgia sufficient for the exercise of jurisdiction under Subsection (3). It has filed 149 UCC liens in Georgia alone. (Exhibit B). Georgia accounts for over 5% of its customer base and hundreds of thousands of dollars of revenue. And FleetSmarts has onboarded multiple customers in Georgia, including by sending its fuel cards to residents of Georgia that can be used in Georgia gas stations. The record developed in discovery evidences Georgia-directed activity: over 5% of its customer base and six-figure Georgia revenue tied to FleetSmarts' program, plus direct solicitation and sales communications into the forum, including calls to a Georgia area code where Plaintiff confirmed he was in Georgia. That is "transacting business" many times over and far from the single phone call and nine emails in *LabMD*.

---

[1] Defendant's discovery responses contend that it placed 4,582 calls to Georgia numbers, but the responses seem to indicate that these responses indicate only *calls*, and do not account for the number of initial *text messages*, like the ones Plaintiff received.

The renewed Motion leans heavily on the idea that FleetSmarts "does not target Georgia" and thus does not transact business here. That is a red herring, since it misstates the applicable standard in a TCPA case, as this Court recognized in its order, noting that there is no one-sized-fits-all approach for this standard. "Courts that have considered the question of what is sufficient for specific jurisdiction under the TCPA have found that repeated contacts targeted at [state] residents, including calls alleged to be violations of the TCPA, can be considered purposeful availment by a defendant." *Traylor v. Livefree Emergency Response Inc.*, No. 1:24-CV-10329-IT, 2024 WL 4943042, at *6 (D. Mass. Dec. 3, 2024) (citing *McDermet v. Porch.com, Inc.*, 2019 WL 1619867, at *2 (D. Mass. Apr. 16, 2019) ("[T]he Complaint alleges that Porch or its agents called McDermet's mobile and home phone numbers that have a Massachusetts area code (978), an allegation sufficient to establish that they purposefully availed themselves of the privilege of doing business in the Commonwealth.")); *Isbell v. Stone & Assocs., LLC*, No. 114CV02990SCJAJB, 2015 WL 13777247, at *3 (N.D. Ga. May 27, 2015) ("Defendant's calls constituted the basis for liability under the FDCPA and FBPA and therefore constitute a tortious act committed in Georgia.").

And, as the Middle District of Georgia remarked, calling a Georgia area code is sufficient for the exercise of jurisdiction to "transact business" here:

> Based on the allegations in Plaintiffs' complaint, the Court finds that it can exercise personal jurisdiction over Entrevoice. Those factual allegations,

> which are taken as true given Entrevoice's default, establish that Entrevoice
> transacted business in Georgia, Entrevoice's violations of the TCPA and
> corresponding harm to the Georgia Plaintiff arose directly from that
> transaction of business, and Entrevoice purposefully directed its conduct at
> Georgia by using an autodialer to call a cell phone with a Georgia area code.
> *See* O.C.G.A. § 9-10-91(1) (permitting the exercise of Georgia long-arm
> jurisdiction over a defendant who "[t]ransacts any business within this
> state"); *Keim v. ADF Midatlantic, LLC*, 199 F. Supp. 3d 1362, 1370 (S.D.
> Fla. 2016) (finding Constitutional Due Process requirements met in TCPA
> case where a defendant text messaged phone numbers affiliated with the
> forum state).

*Hobbs v. Entrevoice Virtual Sols., Inc.*, No. 4:18-CV-247 (CDL), 2019 WL

3400648, at *3 (M.D. Ga. July 25, 2019).

Here, discovery has revealed the same: the subject text messages originated

from the Defendant's telephone numbers, which the Defendant paid for, but which

it hired contractors in the Philippines to handle the customer outreach and contact

functions. Defendant provided those contractors the numbers they were to call.

Those numbers included numbers with Georgia area codes. And discovery has

revealed that Defendant's marketing model is premised on outbound calling or

texting across the United States, and the data shows thousands of Georgia calls.

That is sufficient, particularly after the Supreme Court has rejected strict causation-

based jurisdictional inquiries after *Ford*. "[W]hen a corporation has continuously

and deliberately exploited [a State's] market, it must reasonably anticipate being

haled into [that State's] court[s] to defend actions based on products causing injury

there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 364 (2021).

"Transacting business" does not require physical presence in Georgia. *Thrower v. Matrix Warranty Sols., Inc.*, No. 3:19-CV-00066(CAR), 2020 WL 12656249, at *2 (M.D. Ga. Aug. 13, 2020). Thus, courts must consider both a nonresident's tangible and intangible conduct, such as "mail, telephone calls, and other 'intangible' acts," even if they occurred outside of Georgia, to determine "whether it can fairly be said that the nonresident has transacted any business in Georgia." *Id.* (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1264 (11th Cir. 2010)). Georgia courts will hold a defendant transacted business in Georgia if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this State, (2) the cause of action arises from or is connected with such act or transaction, and (3) the exercise of jurisdiction by the courts of the State does not offend traditional notions of fairness and substantial justice. *Id.* This applies to the TCPA and other consumer protection contexts. "Judges from this District have consistently held that a non-resident debt collector's communications to a Georgia resident in an attempt to collect a debt are sufficient to constitute a tortious act within Georgia under the Georgia long-arm statute." *Otis v. Cheadle*, No. 1:23-CV-4502-MHC-JSA, 2024 WL 3830023, at *10 (N.D. Ga. July 29, 2024), *report and recommendation adopted*, No. 1:23-CV-

4502-MHC-JSA, 2024 WL 4251741 (N.D. Ga. Aug. 13, 2024). The same goes for

TCPA cases, as here. *Hobbs*, 2019 WL 3400648, at *3.

As the entity that placed the calls at issue itself, the Plaintiff has fairly

alleged, and demonstrated through record evidence in the form of the Amazon

subpoena, that the Defendant has transacted business in Georgia through its own

telemarketing calls and text messages using the Philippine call centers it hired and

provided with telephone services it registered in its name and paid for. *Thrower*,

2020 WL 12656249, at *2. Defendant's calling conduct, which targeted the nation

as a whole, has not resulted solely from random, fortuitous, or attenuated contacts

with Georgia. *Id.* Nor did Defendant undertake any efforts to forebear or prohibit

calls to Georgia residents. Rather, the Defendant here sent the messages at issue all

across the country indiscriminately, and, importantly, to Georgia. Reasoning by

contrast, the Plaintiff has been injured in Georgia because he is a Georgia resident

and received the call in Georgia with a Georgia area code. *Cooley v. First Data

Merch. Servs., LLC*, No. 1:19-CV-1185-TWT, 2019 WL 13207579, at *7 (N.D.

Ga. Nov. 15, 2019) (holding no personal jurisdiction where the Plaintiffs did not

allege that the calls "were made from, or received in, Georgia."). This is sufficient.

Just as in *Ford*, Defendant has urged Georgians to purchase its fuel card

products through telephone and text messaging. Defendant's services and cards are

accepted at fueling stations throughout Georga and nationwide. Defendant services

11

Georgia clients. Defendant derives six-figure revenue from Georgia and over 5% of its customer base from this state. *Ford*, 592 U.S. at 365. Defendant has benefitted from Georgia state law and Uniform Commercial Code, Title 11, O.C.G.A., by filing 149 liens against Georgia individuals and small business liens with the Georgia Secretary of State to secure repayment for the fuel purchased by its cards. The cause of action arises here from that very same calling conduct to advertise those cards. And, as the court explained in *Thrower*, the exercise of personal jurisdiction here comports with due process, even if, as Defendant here claims, it "does not have any material connection with Georgia," including not paying taxes or owning property here. 2020 WL 12656249, at *4, *5. Significantly, it has availed itself of the judicial and UCC system here. Indeed, Georgia also has an interest in "adjudicating and resolving disputes in which citizens of [Georgia] are involved, and Plaintiff likewise shares an interest in obtaining convenient and effective relief. *Id.* at *5. As Defendant has transacted *any* business here, it is subject to jurisdiction here.

Moreover, these contacts are substantial enough to constitute minimum contacts under subsection (3) of the long arm statute. Although Defendant cites *Sterling Currency* and *Hayes* for the proposition that less than 1% of total revenue is insufficient to meet the "substantial revenue" requirement, Defendant's argument is flawed for two reasons. First, subsection (3) is *disjunctive*: it can be

satisfied be either "regularly do[ing] or solicit[ing] business," (which Defendant has done) *or* by deriving "substantial revenue." As an initial matter, discovery has shown regular solicitation and a persistent course of conduct into Georgia. That alone satisfies subsection (3), regardless of whether $252,000 is "substantial revenue." FleetSmarts' own responses show a persistent telemarketing program that regularly solicited Goergians, including through results: over 5% of its customers are from Georgia, and $252,941 of its revenue is attributable thereto, particularly where Defendant did not restrict its marketing by state. Public records reveal that FleetSmarts has availed itself of the benefits of the Georgia Secretary of State and Courts in the form of hundreds of UCC lien filings. That is enough under the first two prongs; the Court need not reach the revenue prong.

But even so, this alternative is likewise satisfied. Although, as this Court has noted, Georgia courts have not established a bright-line rule for what constitutes a "persistent course of conduct" or "substantial revenue" under this prong, other Georgia courts have held that even single-digit numbers and percentages can constitute "substantial" revenue, particularly where, as here, the goods or services are offered nationwide as part of a nationwide market. *Candy Craft Creations, LLC v. Gartner*, No. CV 212-091, 2013 WL 12180699, at *5, *6 (S.D. Ga. Feb. 4, 2013) (finding a company with nationwide distribution of a product with $1.017 million in nationwide sales derived "substantial revenue" from Georgia) (citing

*Cont'l Rsch. Corp. v. Reeves*, 419 S.E.2d 48, 51 (Ga. App. 1992) (finding a company who sold $45,000 worth of products in Georgia, which constituted 3% of its gross sales, derived substantial revenue)).

   This very Court has remarked the importance of a liberal inquiry in this regard, particularly in consumer protection litigation, "Keeping in mind Georgia's legitimate interest in preventing Georgia consumers from being misled and in protecting Georgia manufacturers from unfair competition, the court believes that a state court would neither consider $19,000 an insubstantial sum nor treat the solicitations made by defendant's salesman to be outside of the subsection's scope." *H.K. Corp. v. Lauter*, 336 F. Supp. 79, 81 (N.D. Ga. 1971). And, as the Middle District observed, Defendant's admitted failure to exclude Georgia business from its nationwide marketing efforts is also a factor in determining that "substantial revenue" was derived from Georgia, "Olympus Medical did not exclude Georgia from the territory in which its medical products could be sold. A medical device manufacturer like Olympus Medical should reasonably expect its products to be sold in Georgia when it sells those products to an affiliated company for the purpose of distributing the products throughout the United States and does not exclude Georgia from the territories where its products may be sold." *Collett v. Olympus Med. Sys. Corp.*, 437 F. Supp. 3d 1272, 1278 (M.D. Ga. 2020).

   That being the case here, the numbers that jurisdictional discovery has

adduced: hundreds of thousands of sales with thousands of phone calls (which

likely excludes text messages), to a customer base that is over five percent of its

total customer base, the Defendant has caused a tort outside Georgia while having

a substantial, non-insignificant presence in Georgia, as this Court has already

recognized on a similar fact pattern. *Rice v. PetEdge, Inc.*, 975 F. Supp. 2d 1364,

1368, 1371 (N.D. Ga. 2013) (finding personal jurisdiction existed where the

defendant's Georgia customers accounted for 1-2% of net sales across five years,

which "illustrat[ed] a consistency that rises above a random sale or two"). This

case is nothing like others, like *LabMD*, where defendants engaged in limited

marketing conduct that resulted in only, at most, a handful of isolated and sporadic

sales and shipments into Georgia. *Contra Jordan Outdoor Enters., Ltd. v. That

70's Store, LLC*, 819 F. Supp. 2d 1338, 1343 (M.D. Ga. 2011) (dismissing where

defendant operated a nationally-accessible website but where "[t]he websites failed

to generate any business for Defendants in Georgia."); *but see Aero Toy Store, LLC

v. Grieves*, 631 S.E.2d 734, 740 (Ga. App. 2006) (finding that the defendant

transacted business in Georgia based on defendant's operation of an "interactive

website through which it has reached out to, and done business with, persons in

Georgia.").

   Given that "the Court is required to make all reasonable inferences in favor

of [Plaintiff]," *Candy Craft*, 2013 WL 12180699, at *5, this Court should err in the

side of finding jurisdiction. It is also evident that due process is satisfied. FleetSmarts purposefully directed repeated telemarketing to Georgia residents (including Mr. Bond), secured and serviced hundreds of Georgia accounts, and earned six-figures from Georgia business. The claims arise out of those Georgia contacts, the very calls and texts at issue) and exercising jurisdiction is fair. FleetSmarts already runs a nationwide telemarketing program that reaches Georgia by design and admits it is not restricted by state. The Court should hold there is jurisdiction.

B.     *The Defendant's Rule 12(b)(6) motion must be denied because the Plaintiff has plausibly alleged facts which support his Do Not Call Registry claim, which presumes that such phones are presumptively residential.*

The Court previously did not reach merits of the Defendant's Rule 12(b)(6) motion and denied the first Motion to Dismiss pending jurisdictional discovery. Now that jurisdiction has been established, this Court should defer ruling on the business/residential issue after opening discovery now and have a jury rule on those issues at trial. The Plaintiff incorporates his previous arguments for why his number is a residential number as though fully set forth herein, but wishes to further demonstrate that the issue is one for trial.

1. To the extent the use of the number is an issue (it is not), that is a
   question for trial.

As the Plaintiff observed in his original opposition, the FCC, the agency

charged with implementing rules for Do Not Call Registry, defines a "residential

subscriber" as "a subscriber to telephone exchange service that is not a business

subscriber" and a business subscriber is a "subscriber to telephone exchange

service for businesses." 47 C.F.R. § 64.2305(b), (d). This language excludes only

one type of service–telephone exchange services for businesses–from the

protections afforded by the DNC. The fact the regulation contains only one

exclusion demonstrates that the regulation errs on the side of being overinclusive,

not underinclusive. And Mr. Bond has pled and confirmed in his Declaration that

he is a subscriber to a telephone exchange service for consumers, not one for

businesses, and uses his number for personal, non-business use. As he is a

subscriber to a cellular telephone service, his telephone number is presumptively

residential. *FCC Report and Order*, 18 FCC Rcd. 14014, 14039 (2003).

Courts nationwide have agreed. *See, e.g.*, *Tsolumba v. SelectQuote Ins.

Servs.*, No. 5:22-CV-00712, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20,

2023) ("This Court therefore joins the majority of courts throughout the country

who have held that cell phones like [plaintiff's] are entitled to the TCPA's

protection as residential telephones."); *Sasin v. Enter. Fin. Grp., Inc.*, No. CV 17-

4022-CBM-RAO, 2017 WL 10574367, at *5 (C.D. Cal. Nov. 21, 2017) (denying

MTD for personal cell on DNC); *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) (same); *Phillips v. Mozes, Inc.*, No. 2:12-CV-04033-JEO, 2014 WL 12589671, at *6 (N.D. Ala. Sept. 3, 2014) (holding that allegation that cell phone was registered on DNC created reasonable inference of residential use); *Doyle v. JTT Funding, Inc.*, No. LACV1806145JAKASX, 2019 WL 13037025, at *8 (C.D. Cal. Dec. 2, 2019) (judgment for plaintiff).

On a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor. The issue is not whether Plaintiff will ultimately prevail, but whether his complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. 662, 663. Here, the Complaint alleges in detail, and Plaintiff's declaration confirms, that Plaintiff's Georgia number is a personal, residential cellular number subscribed in his name, billed to a consumer on that plan, and registered on the National Do Not Call Registry. It has been his cellular number at all times pertinent. Those sworn allegations must be accepted as true at this stage. To this regard, Defendant's urging of "judicial notice" is misapprehended. Judicial notice is limited to the *existence* of public records, not the *truth* of their contents or contested inferences contained within them, as Defendant's own authorities, including *Patrick* and *LTL*

18

*Shipping*, counsel.

To the extent that the Plaintiff's number may not be residential, and particular factual questions as to whether a number is "residential" for purposes of the TCPA is a fact-intensive question not resolvable on a motion to dismiss. The Complaint pleads, and Mr. Bond's declaration confirms, that he uses the number for residential purposes. At this stage, the Court must credit those allegations. Even to the extent that the extrinsic submitted by Defendant are permissibly considered on a Rule 12(b)(6) motion (they are not), the Plaintiff's pleading and Declaration raise factual disputes as to the Plaintiff's use of the number that cannot be resolved now. As the Plaintiff explains, the Plaintiff used the number to start his business, but now that his business is established, he does not use his number for business purposes. Given that the Plaintiff has in fact explained the Defendant's extrinsic evidence, although he is not required to, the Court should deny the motion.

A defendant cannot use disputed and explained extrinsic evidence as a vehicle for testing the factual accuracy of a complaint. Defendant further seems to contend that ever using a telephone number, at any point, for any business purpose whatsoever, confers an indelible mark on that telephone number rendering it permanently ineligible for inclusion on the National Do Not Call Registry. Not only does that proposition find no support in the law, but such a standard would essentially render no phone number eligible for inclusion on the Do Not Call

Registry, as doubtlessly counsel for the Defendant, this Court, and its hardworking staff have occasionally taken Court-related calls on their personal cell phones. Thus, Mr. Bond's prior use of his number to start his business does nor confer an indelible mark on its character, and Mr. Bond has stated a claim. Setting aside the defects with Defendant's extrinsic evidence, the (at best, disputed) factual allegations and averments in the Complaint and Declaration establish a plausible claim under the TCPA's residential protections and underscore the need to (at best) take discovery on the use of the number and associated timeline(s) under which his number was solely business, solely residential, or mixed use, and the degree of the mixed use, so that Defendant may make the argument at a jury trial and a jury may determine the nature of the number.

Section 227(c)(5) of the TCPA provides a private right of action to "*A person* who has received more than one telephone call within any 12-month period." The FCC's regulations make clear that wireless subscribers may register on the National Do Not Call Registry and are to be treated the same as residential wireline subscribers. *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14037 (2003). The Ninth Circuit has recognized that registration of a cell phone on the National Do Not Call Registry is dispositive of residential status, particularly for pleading purposes, as such numbers are "presumptively residential." *Chennette v. Porch.com, Inc.*, 50 F.4th

1217, 1225 (9th Cir. 2022). A defendant like FleetSmarts may, of course, overcome that presumption through evidence adduced in discovery. *Id.* But it may not do so at the pleadings stage. For example, the Eastern District of New York *denied* a defendant's motion to dismiss because the court did not have "sufficient evidence before [it] to determine whether the telephone line at issue is 'residential.'" *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369, 2014 WL 4954618, at *1 (E.D.N.Y. Oct. 2, 2014). And a number may be re-established as residential once a plaintiff demonstrates that they ceased using a number at issue for business purposes. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *4, *5 (E.D. Pa. Mar. 14, 2025). This motion should be denied outright or at minimum the question of the use of the number reserved for trial.

     2.  Discovery must not be bifurcated.

As the Plaintiff has noted, bifurcation of this case is particularly inappropriate because the majority of district courts have concluded that a cell phone used for both personal and business purposes can still be regarded as "residential" without further pleading. As nearly every district and circuit court to address this issue has concluded, allegations nearly identical to those here are sufficient to allow the Court to conclude that a cell phone is "residential" for MTD purposes. *See, e.g.*, *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir.

2023); *Rosenberg v. LoanDepot.com LLC*, No. 19-10661-NMG, 2020 U.S. Dist. LEXIS 11928, at *27 (D. Mass. Jan. 24, 2020) ("Rosenberg submits that he placed his cellular phone number on the National Do Not Call registry and that he uses his cell phone as his residential line. Those allegations are adequate for the purposes of pleading."); *Barton v. Temescal Wellness, LLC*, No. 4:20-cv-40114-TSH, 2021 U.S. Dist. LEXIS 42211, at *13-14 (D. Mass. Mar. 8, 2021); *Boardman v. Green DOT Corp.*, No. 21-cv-174, U.S. Dist. LEXIS 156403, at *1, 4-6 (W.D.N.C. Aug. 19, 2021); *Sagar v. Kelly Auto Grp., Inc.*, No. 21-cv-10540, 2021 U.S. Dist. LEXIS 227781, at *16 (D. Mass. Nov. 29, 2021). Indeed, the only way of proving a number is *not* residential, as articulated above, is by showing that the number is assigned to a telephone exchange service for business, a fact which is readily ascertainable from various commercial databases. Accordingly, it is unclear as to what (if any) bifurcated discovery with respect to the Plaintiff or his use of the cellular telephone number will establish. Moreover, particularly at the procedural posture here, bifurcation would simply frustrate and impede good judicial economy and common sense.

Bifurcation (in reality, at the procedural posture here, trifurcation) of discovery is often "counterproductive." Manual For Complex Litigation (Fourth) § 21.15 (2015). To begin, the proposed trifurcation guarantees that the parties will need to continue duplicate their work. Having completed jurisdictional discovery,

the Defendant now asks the Court to embark on additional individualized merits discovery with all that will entail again: written discovery requests, depositions, and briefing, all limited just to the Plaintiff's use of the number at issue. Then, Defendant would file a dispositive motion to Plaintiff's individual claims of liability. And then, should the Court deny the Defendant's inevitable motion for summary judgment, the parties would have to start all over again a third time, serving discovery requests and taking depositions of the same witnesses a third time, for the same exact liability information, but this time focusing on classwide issues of number use premised on the *very same set of evidence with respect to the Plaintiff*. And after that, there would be a third round of motions practice on the class claims. In other words, the parties would engage in much the same discovery differing only in scope of information that is already ESI and just as readily produced in digital format for one individual as one million.

Indeed, "bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions." *Hartley-Culp v. Credit Mgmt. Co*, No. 3:cv-14-0282, 2014 U.S. Dist. LEXIS 130308, *10 (W.D. Pa. Sept. 15, 2014). The Court should deny Defendant's motion to bifurcate for this reason alone, particularly as the Defendant has already obtained one round of bifurcated discovery. *See id.* (denying similar motion to bifurcate merits and class discovery

in a TCPA case); *EQT Prod. Co. v. Terra Servs., LLC*, No. 14-1053, 2014 U.S.

Dist. LEXIS 203680, *4 (W.D. Pa. Oct. 21, 2014) ("Terra's proposal would likely

result in deposing the same witnesses twice-once in the liability phase, and again in

the damages phase. This is the definition of inconvenience, and the additional cost

of duplicative depositions and document review combine to counsel against

bifurcation in this case."). The lack of judicial economy and waste of resources

here would result in the very type of piecemeal litigation by endless motions

practice that the Rules prohibit. FED. R. CIV. P. 12(g)(2).

Courts have repeatedly recognized that bifurcating merits and class

discovery is often impractical and inefficient because the two are frequently

intertwined, also leading to needless discovery disputes. Class certification requires

a "rigorous analysis" under Rule 23 - one that "will frequently entail overlap with

the merits of the plaintiff's underlying claim" because "the class determination

generally involves considerations that are enmeshed in the factual and legal issues

comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 351 (2011); see also *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34

(2013); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y.

2012). This is especially true in TCPA class actions, where courts have noted that

"[t]he distinction between class certification and merits discovery is murky at best

and impossible to determine at worst." *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. 15-2057, 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018).

To that end, the basic evidence of the use of the numbers at issue, and whether the numbers that Defendant texted are cell phones, are simply readily available electronically stored records of the type that courts routinely hold are readily accessible on a daily basis, negating any allegations of burden. Once those records are collected, which is no more burdensome for records with respect to the Plaintiff and the messages he received than for other class members, then the Plaintiff, not the Defendant, will then bear the cost of having his expert analyze them to determine class membership and whether the numbers are presumptively residential cell phones. Simply put, there is little to no burden or prejudice on the Defendant and a great prejudice to the Plaintiff, who would be deprived of the information he needs to develop his theory of the case, develop any possible alternative theories, propound additional discovery, and make the "rigorous" showing he is required to at class certification.

Given that the Defendant has already received one set of bifurcated discovery, it should not get another. This Court should order discovery open for all purposes, instead of adopting the Defendant's proposed piecemeal motion-and-discovery strategy that will effectively drag out this case indefinitely.

## IV.    CONCLUSION

This Court must deny Defendant's renewed motion to dismiss in its entirety.

Dated: September 8, 2025

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

## **LOCAL RULE CERTIFICATION**

I certify that this document complies with the requirements of Local Rule 5.1(B).

September 8, 2025

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

September 8, 2025

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.